## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**ABDULLA THANI FARIS AL-ANAZI, et al.,**

    **Petitioners,**

       **v.**

**GEORGE W. BUSH, et al.**

    **Respondents.**

**Civil Action No.  05-0345 (JDB)**

---

### <u>MEMORANDUM OPINION</u>

Petitioners Abdulla Thani Faris Al-Anazi, Adel Egla Hussan Al-Nussairi, N.A.O.,[1] Abdulaziz Sa'ad Oshan, and Ibrahim Suleiman Al-Rubaish (collectively the "petitioners") have filed a petition for a writ of habeas corpus challenging the legality of their detention by the United States at the United States Naval Station at Guantanamo Bay, Cuba ("Guantanamo"). Presently before the Court is petitioners' motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65 and the All Writs Act, 28 U.S.C. § 1651, which as it has evolved now seeks an order requiring respondents to provide petitioners' counsel with 30-days' notice of any proposed transfer of petitioners from Guantanamo to any location outside of the United States.  For the reasons that follow, the Court denies petitioners' motion.[2]

---

[1]  Petitioner N.A.O. was a minor at the time he was first detained at Guantanamo, and hence is referred to by his initials only.

[2]  Several other issues are also before the Court, including respondents' motion to stay proceedings.  Those issues will be addressed in this opinion as well.

**BACKGROUND**

I.      **Procedural History**

Petitioners have been detained by the United States at Guantanamo for approximately the last three years.  On February 17, 2005, they filed a petition for a writ of habeas corpus in this Court seeking, among other forms of relief, their release from the custody of the United States. This petition is similar to many others filed by Guantanamo detainees in the United States District Court for the District of Columbia both before and since the Supreme Court held in Rasul v. Bush, 124 S.Ct. 2686, 2698 (2004), that the federal habeas statute "confers on the District Court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base."

Late last year, eleven petitions advancing the claims of several dozen detainees were consolidated for further proceedings before Judge Joyce Hens Green, including a petition assigned to this judge, O.K. v. Bush, No. 04-CV-1136.  On January 31, 2005, Judge Green granted in part and denied in part the government's motion to dismiss, holding that the Guantanamo detainees before her possessed constitutional and other legal grounds to challenge their detention.  See In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 481 (D.D.C. 2005). Almost simultaneously, on January 19, 2005, Judge Richard Leon of this Court granted the government's motion to dismiss the habeas petitions of two other Guantanamo detainees, concluding that there was no constitutional or other basis to challenge their detention.  See Khalid v. Bush, 355 F. Supp. 2d 311, 314 (D.D.C. 2005).  Those cases have been consolidated on appeal before the United States Court of Appeals for the District of Columbia Circuit.  On February 3,2005, Judge Green issued a stay in the eleven consolidated cases pending the appeal.

II.     **Transfers From Guantanamo**

On March 17, 2005, petitioners filed a motion for preliminary injunction.  Although originally framed as an attempt to enjoin respondents from effectuating the transfer of petitioners from Guantanamo, the motion is now confined to the alternative request that respondents provide 30-days' notice (once a transfer has been decided) before a transfer actually occurs.  The motion appears to have been prompted by a number of newspaper articles recently published about the transfer of detainees.  Petitioners rely most heavily on an article in the March 11, 2005, edition of the New York Times reporting that the Pentagon is seeking to enlist the assistance of other departments in the United States government "in a plan to cut by more than half the population at its detention facility in Guantanamo Bay, Cuba, in part by transferring hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan and Yemen, according to senior administration officials."  Douglas Jehl, Pentagon Seeks to Shift Inmates from Cuba Base, N.Y. Times, Mar. 11, 2005, at A1.

Petitioners also cite articles discussing an alleged practice known as "rendition."  Under this procedure, the Central Intelligence Agency ("CIA") allegedly transfers foreign nationals from one country to another, where the receiving governments are expected to carry out the will of the United States.  In one article, a former detainee alleged that prior to being moved to Guantanamo, he had been transferred to Egypt and questioned there by United States officials.  See Megan K. Stack and Bob Drogin, Detainee Says U.S. Handed Him Over for Torture, L.A. Times, Jan. 13, 2005, at A1.  Petitioners also cite an article discussing the case of a Syrian-born Canadian citizen who alleged that he was detained by the United States at Kennedy Airport immediately following September 11, 2001, and then transported to Syria, where he was interrogated and tortured before

being released and returned to Canada.  See Pet'rs' Mem. ¶ 7; Douglas Jehl and David Johnson,

Rule Change Lets CIA Freely Send Suspects Abroad, N.Y. Times, Mar. 6, 2005, at A1.

Petitioners concede that none of these incidents involve the transfer of detainees out of

Guantanamo.  See Transcript of Motions Hearing ("Tr.") at 12:20-13:5 (April 13, 2005).  Even

the New York Times article on which they place the greatest weight notes the distinction

between Guantanamo transfers and CIA rendition:

> Unlike the Pentagon, the C.I.A. was authorized by President Bush after the Sept. 11 attacks to transfer prisoners from one foreign country to another without case-by-case approval from other government departments.  Former intelligence officials said that the C.I.A. has carried out 100 to 150 such transfers, known as renditions, since Sept. 11.  By contrast, the transfers carried out by the Pentagon are subject to strict rules requiring intraagency approval.  Officials said that the transfers do not constitute renditions under the Pentagon's definition, because the government that accept the prisoners are not expected to carry out the will of the United States.

Id.

In response to petitioners' claims, respondents have submitted to the Court declarations

from two high-ranking Department of Defense and Department of State officials describing the

procedures that govern the detention and transfer of Guantanamo detainees.  See Decl. of

Matthew C. Waxman ("Waxman Decl."); Second Decl. of Matthew C. Waxman ("Second

Waxman Decl."); Decl. of Pierre-Richard Prosper ("Prosper Decl.").  The officials state that the

United States has no interest in detaining the 540 foreign nationals presently at Guantanamo any

longer than necessary, and that the Department of Defense ("DOD") therefore conducts at least

an annual review of whether each detainee merits continued detention.  Waxman Decl. ¶ 3.

The officials further explain that when detention is no longer deemed necessary, the DOD

may transfer the detainee to the control of another country with the understanding that the

country will release the individual.  Id.  Where the "appropriate conditions" exist, the DOD will

also transfer detainees "to the control of other governments for investigation and possible

prosecution and continued detention when those governments are willing to accept responsibility

for ensuring, consistent with their laws, that the detainees will not continue to pose a threat to the

United States and its allies."  Id.  Such governments can include the government of a detainee's

home country, or a country other than the detainee's home country that may have law

enforcement or prosecution interest in the detainee.  Id.

As of April 13, 2005, two hundred and fourteen (214) detainees had been transferred

from Guantanamo.  Id.; Second Waxman Decl. ¶ 2.  Of those, one hundred forty-nine (149) were

transferred for release and sixty-five (65) were transferred for continued custody.  Waxman Decl.

¶ 4; Second Waxman Decl. ¶ 2.[3]  Each of the 65 detainees transferred for custody has been

transferred to his home government.  Id. ¶ 4.  Most of those 65 have subsequently been released

as well.  Id. ¶ 5.  Respondents also indicated at the April 13, 2005 motions hearing that some

detainees transferred for release have in fact been detained by their home governments.  In the

cases where a detainee is transferred for continued detention by the detainee's home government,

DOD "does not ask or direct the receiving government to detain the individual on behalf of the

United States," and "the detainees are no longer subject to the control of the United States once

they are transferred."  Id.

Once a transfer is proposed, DOD consults other interested parties in the United States

---

[3]  An April 19, 2005 DOD News Release indicates that an additional 18 detainees were
recently transferred for release, bringing the total to two hundred thirty-two (232) transferred and
one hundred sixty-seven (167) transferred for release.  See Department of Defense, Detainee
Transfer Announced, Apr. 19, 2005, available at
http://www.defenselink.mil/releases/2005/nr20050419-2661.html (last visited April 20, 2005).

government, and in particular the Department of State.  Id. ¶ 6.  The Department of State is responsible for initiating discussions with the foreign government regarding transfer.  Prosper Decl. ¶ 6.  The purpose of these discussions is to learn the measures that the foreign government will take to ensure the detainee does not pose a continuing threat to the United States or its allies, and to receive appropriate assurances regarding the transfer.  Id.  The necessary assurances include assurances that the detainee will be humanely treated in accordance with international obligations.  Id.  If the foreign government is a party to the relevant treaties, i.e., the Torture Convention, the Department of State will pursue further assurances.  Id.

Decisions regarding assurances from a foreign government are made on a case-by-case basis, considering the particular circumstances of the transfer, country, and individual involved and concerns regarding possible torture and persecution.  Id. ¶ 7.  The essential question in evaluating the assurances regarding treatment of a detainee proposed for transfer is whether the Department of State officials "believe it is more likely than not that the individual will be tortured in the country to which he is being transferred."  Id. ¶ 8.  When making this determination, the United States considers the identity, position, and information concerning the official providing the assurances, as well as political or legal developments in the country.  Id.  The Department of State also considers the United States diplomatic relations with the foreign government in assessing the sufficiency of assurances received, and will in some instances seek access to the individual by governmental and non-governmental entities in the foreign country in order to monitor the individual's return.  Id.  In the past, DOD has decided against the transfer of detainees because of concerns about torture in countries of origin.  Waxman Decl. ¶ 7.

On the basis of their newspaper articles, and notwithstanding respondents' declarations,

petitioners have asked this Court to issue a preliminary injunction ordering respondents to

provide 30-days' notice prior to any transfer of a petitioner from Guantanamo.  Because such

advance notice would be provided only after DOD has decided to transfer a detainee, petitioners

concede, as they must, that they are essentially requesting an order preventing the United States

from transferring any Guantanamo detainee for 30 days.  See Tr. at 4:1-4:15.  Other Guantanamo

detainees have filed similar motions for preliminary injunctions before other judges in this

District seeking notice prior to any transfer from Guantanamo.  Generally, other judges have

ordered some form of the requested 30-days' notice, either by granting the motion for preliminary

injunction, see Abdah v. Bush, No. 04-CV-1254 (HHK) (March 29, 2005 Order); Al-Joudi v.

Bush, No. 05-CV-0301 (GK) (April 4, 2005 Order), by including the 30-days' notice as a

condition of granting respondents' motion to stay the case, see Abdullah v. Bush, No. 05-CV-

0023 (RWR) (March 16, 2005 Order), or by requiring the 30-days' notice pursuant to the All

Writs Act, see Ameziane v. Bush, No. 05-CV-0392 (ESH) (April 12, 2005 Order).  In one other

case, Almurbati v. Bush, No. 04-CV-1227 (RBW) (April 14, 2005 Order), the court denied the

requested 30-days' notice.  In addition to the motion for a preliminary injunction, also before the

Court are respondent's motion to stay and petitioners' requests for an order to show cause, entry

of a protective order,[4] and issuance of factual returns.

---

[4]  Neither party opposes the entry of protective orders identical to those entered by Judge
Green in the cases consolidated before her.

## LEGAL STANDARD

To prevail on their motion for a preliminary injunction, petitioners must demonstrate (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm absent the relief requested; (3) that other interested parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief.  Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004); Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001); Taylor v. Resolution Trust Corp., 56 F.3d 1497, 1505-06 (D.C. Cir. 1995); Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977).  In determining whether to grant urgent relief, a court must "balance the strengths of the requesting party's arguments in each of the four required areas."  CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995).  "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  Id.  It is particularly important for petitioners to demonstrate a substantial likelihood of success on the merits; where a plaintiff cannot show a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor."  Davenport v. Int'l Bhd. of Teamsters, AFL-CIO, 166 F.3d 356, 366-67 (D.C. Cir. 1999); Nat'l Head Start Ass'n v. Dep't of Health and Human Servs., 297 F. Supp. 2d 242, 246 (D.D.C. 2004) (factors "must be balanced against each other, but it is especially important for the movant to demonstrate a likelihood of success on the merits").[5]

---

[5]  The test for a stay or injunction pending appeal is essentially the same, see United States v. Philip Morris, Inc., 314 F. 3d 612, 617 (D.C. Cir. 2003) (citing Holiday Tours, 559 F. 2d at 843), although courts often recast the likelihood of success factor as requiring only that the movant demonstrate a serious legal question on appeal where the balance of harms strongly favors a stay, see Holiday Tours, 559 F. 2d at 844 ("fair ground for litigation" or "serious legal

Because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. Sociedad Adonima Vina Santa Rita v. United States Dep't of the Treasury, 193 F. Supp. 2d 6, 13 (D.D.C. 2001); see Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969). The Supreme Court has stated that "'[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); accord Cobell, 391 F.3d at 258.

## ANALYSIS

I.  **Motion for 30-Days' Notice**

  A.  **Substantial Likelihood of Success on the Merits**

Petitioners argue that they have a substantial likelihood of succeeding on the merits of their claims because Judge Green has already denied respondents' motion to dismiss in the consolidated habeas petitions challenging the legality of their detention at Guantanamo. The Court agrees that the appeals from Judge Green's and Judge Leon's decisions raise at least a serious question of law. However, the presence of a sound basis to challenge the legality of one's *detention* does not at all imply that there exists a sound basis to challenge the legality of one's *transfer*. Put differently, the "merits", if you will, to be assessed for purposes of the present claim for preliminary injunctive relief, is petitioners' challenge to their *transfer* from Guantanamo, not to their *detention* at Guantanamo.

---

question"). See generally Cuomo v. United States Nuclear Reg. Comm'n, 772 F. 2d 972, 978 (D.C. Cir. 1985) (movant must in any event justify the extraordinary remedy).

Petitioners have not come forward with any legal authority that can be read to prohibit the transfer of Guantanamo detainees to a foreign country; any evidence that the United States is transferring Guantanamo detainees to foreign countries for an illicit purpose; or any reason to doubt the statements in the sworn declarations of high-level Department of Defense and Department of State officials that the United States relinquishes control of the detainees upon transfer to the foreign state and obtains all assurances necessary under the law from the foreign state that the detainee will be treated humanely upon transfer.

Petitioners contend that because they may face torture by a foreign state upon transfer, an injunction should issue.  However, they do not identify a single legal provision that prohibits or even limits the transfer of wartime detainees to other countries.  They reference in their papers the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, § 2242, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note), which states that it "shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."  FARRA § 2242(a).  However, FARRA also expressly states that this "policy" shall not be "construed as providing any court jurisdiction to consider or review claims raised under the Convention [Against Torture][6] or this section . . . except as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act."  Id. § 2242(d).  Petitioners do not attempt to explain how this language is consistent with the recognition of binding rights under FARRA outside of the context of a final order of removal.

---

[6] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 46, U.N. GAOR 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984), reprinted in 23 I.L.M. 1027 (1984).

See, e.g., Cornejo-Barreto v. Siefert, 379 F.3d 1075, 1086 (9th Cir. 2003) ("While § 2242(d)

plainly contemplates judicial review of final orders of removal for compliance with the Torture

Convention and the FARR Act, it just as plainly does not contemplate judicial review for

anything else."), vacated as moot, 389 F.3d 1307 (9th Cir. 2004) (en banc).

Counseling even further against judicial interference in the transfer of detainees to other

countries is a well-established line of cases in the extradition context holding that courts will not

conduct an inquiry into "the procedures or treatment which await a surrendered fugitive in the

requesting country." United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quotation

omitted). Known as the "rule of non-inquiry," this doctrine is "shaped by concerns about

institutional competence and by notions of separation of powers," and stands for the general

proposition that "it is the function of the Secretary of State--not the courts--to determine whether

extradition should be denied on humanitarian grounds." Kin-Hong, 110 F.3d at 110; Sidali v.

INS, 107 F.3d 191, 195 n.7 (3d Cir. 1997); see also Ahmad v. Wigen, 910 F.2d 1063, 1067 (2d

Cir. 1990) ("The interests of international comity are ill-served by requiring a foreign nation ... to

satisfy a United States district judge concerning the fairness of its laws and the manner in which

they are enforced."); Escobedo v. United States, 623 F.2d 1098, 1107 (5th Cir. 1980) ("[T]he

degree of risk to [Escobedo's] life from extradition is an issue that properly falls within the

exclusive purview of the executive branch.") (citations and quotations omitted). The same

separation of powers principles underlying the rule of non-inquiry have been applied outside of

the non-extradition context to limit judicial review of the treatment of individuals in a foreign

state. See Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("In situations such as this, the

controlling considerations are the interacting interests of the United States and of foreign

countries, and in assessing them we must move with the circumspection appropriate when a court

is adjudicating issues inevitably entangled in the conduct of our foreign relations.") (citations and

quotations omitted); see also People's Mojahedin Org. v. Dep't of State, 182 F.3d 17, 23 (D.C.

Cir. 1999) (holding that foreign policy decisions by the Executive "are political judgments,

decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and

have long been held to belong in the domain of political power not subject to judicial intrusion or

inquiry" (quotation omitted)).

Besides requesting an order to block the transfer on humanitarian grounds, petitioners

also invoke the broad authority of the Court under the All Writs Act, on the theory that 30-days'

notice (followed by judicial review of the grounds of transfer) is necessary to protect the Court's

jurisdiction over petitioners' habeas petitions.  See Pet'rs' Mem. ¶¶ 11-13.  Petitioners' concern is

that upon transfer for continued detention elsewhere, petitioners would lose their rights to have

the legality of their detention adjudicated by this Court.  Id. ¶ 13.

The All Writs Act empowers a district court to "issue all writs necessary or appropriate in

aid of their respective jurisdictions and agreeable to the usages and principles of law."   28

U.S.C. § 1651; SEC v. Vision Communications, Inc., 74 F.3d 287, 291 (D.C. Cir. 1996) (All

Writs Act "empowers a district court to issue injunctions to protect its jurisdiction").   Like a

motion for a preliminary injunction, the All Writs Act is an extraordinary remedy pursuant to

which a court may "enjoin almost any conduct which, left unchecked, would have . . . the

practical effect of diminishing the court's power to bring the litigation to a natural conclusion."

Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1102 (11th Cir.2004) (quotation omitted); see

also Alabama Great S. Ry. Co. v. Thompson, 200 U.S. 206, 218 (1906) (federal courts "may and

should take such action as will defeat attempts to wrongfully deprive parties of the protection of their rights in those tribunals").

At the outset, there is no evidence in the record that respondents are seeking to thwart this Court's jurisdiction.  Petitioners have provided the Court with no evidence whatsoever that DOD is transferring (or planning to transfer) Guantanamo detainees as a pretext for continuing United States detention in collusion with a foreign state (or on its own) on foreign soil. Respondents have submitted declarations stating emphatically that this is not the practice of DOD. See Waxman Decl. ¶ 5 (DOD "does not ask or direct the receiving government to detain the individual on behalf of the United States.  Accordingly, the detainees are no longer subject to the control of the United States once they are transferred."); id. ¶ 4 ("[T]here [is no] plan to effect transfers of GTMO detainees in order to thwart the actual or putative jurisdiction of any court with respect to the detainees.").[7]  Even the newspaper articles on which petitioner stake their motion draw a clear distinction between alleged acts of CIA rendition (where the foreign countries are "expected to carry out the will of the United States") and the alleged Guantanamo transfers (where the foreign countries are not "expected to carry out the will of the United States").  See Jehl, supra, at A1.

More importantly though, there is no justification for issuance of an injunction pursuant to the All Writs Act when petitioners are obtaining the same relief through transfer that they

---

[7]  Of the 232 detainees that have been transferred from Guantanamo as of the date of this opinion, 131 were transferred at least three months prior to the Supreme Court's decision in Rasul v. Bush recognizing the jurisdiction of the federal courts over the habeas petitions of Guantanamo detainees, thus casting doubt on petitioners' suggestion that DOD is undertaking a policy of transfer to thwart the jurisdiction of the courts.  See Department of Defense, Transfer of Afghani and Pakistani Detainees Complete (March 15, 2004) available at http://www.defenselink.mil/releases/2004/nr20040315-0462.html (last visited April 20, 2005).

could hope to obtain through habeas.  In this case, petitioners have properly invoked this Court's jurisdiction under habeas to determine the legality of their detention.  See Rasul, 124 S. Ct. at 2698; Pet. at 28.  Now, however, petitioners want this Court, pursuant to the All Writs Act, to delay or even block their release so that petitioners can fully adjudicate their habeas petitions. See Pet'rs' Mem. ¶ 13.  But there is no basis for the Court to maintain its jurisdiction to consider such extraordinary relief when the record shows that petitioners would obtain the same level of relief via transfer that they could get from full adjudication of their habeas petition.  Were the Court to preserve its jurisdiction over the habeas petitions, and ultimately determine that the United States may no longer detain the petitioners, the parties and the Court would find themselves in precisely the same position in which they find themselves now -- with the respondents taking steps to transfer those individuals out of United States control, and the petitioners compelled to come forward with some legal or evidentiary basis to prevent a transfer to an "undesireable" country.  If respondents release petitioners now, that in no way prevents the "natural conclusion" of this litigation, i.e., release of petitioners, and therefore there is no basis for this Court to issue an injunction pursuant to the All Writs Act.  See Klay, 376 F.3d at 1102.

The Court emphasizes that it reaches this result today based on the record with which it is presented -- there is no evidence that DOD is transferring Guantanamo detainees to foreign countries for an illicit purpose, and quite a bit of evidence to the contrary (including petitioners' own newspaper articles and, more importantly, the declarations of high level government officials).[8]  Respondents indicated at the hearing on petitioners' motion that they share the view

---

[8]  The Court is aware of and sensitive to the fact that petitioners' counsel have not yet had the opportunity to meet with petitioners, and as a more general matter do not have access to the often classified information that would shine light on the detention and possible transfer of

of the Court that they have an ongoing obligation to inform the Court if DOD were to begin

transferring Guantanamo detainees overseas for continuing United States custody (either on its

own or in collusion with a foreign state).  On the current record, however, there is simply no

basis in law or fact to challenge the transfer of Guantanamo Bay detainees to a foreign country.[9]

### B.      Irreparable harm

By the same token, petitioners cannot show that they will suffer irreparable harm in the

absence of the injunction they seek.  The lynchpin of a request for preliminary injunctive relief is

a showing of irreparable injury to the movant in the absence of the requested relief.  See

Sociedad Anonima, 193 F. Supp. 2d at 13-14.  The harm must be concrete and immediate to

---

petitioners.  None of this relieves petitioners of the burden of coming forward with *at least some*
information to support their request for the extraordinary relief of a preliminary injunction
against the transfer of these detainees.  The Court notes that petitioners' counsel indicated at the
April 13, 2005 hearing that a meeting with clients will occur after counsel receives the necessary
security clearance.

[9]  Petitioners have cited this Court's decision in Abu Ali v. Ashcroft, 350 F. Supp. 2d 28
(D.D.C. 2004), in which the Court held that jurisdiction could potentially exist over a habeas
petition by a United States citizen detained in a Saudi prison who alleged that he was being held
at the behest and ongoing direction of the United States, as an example of a case where the
United States was using a foreign intermediary to avoid the jurisdiction of the United States
courts.  See Pet'rs'.' Mem. ¶ 9.  Abu Ali is not particularly instructive here.  This Court's decision
in Abu Ali was at the motion to dismiss stage, where the Court was obliged to accept petitioners'
allegations of collusion between the United States and Saudi Arabia as true.  Abu Ali, 350 F.
Supp. 2d at 34-35.  Here, petitioners bear the heavy burden of proving their entitlement to
preliminary injunctive relief.  Moreover, the petitioners in Abu Ali came forward with a variety
of different types of information suggesting United States involvement in the detention, including
newspaper articles quoting named United States officials, declarations containing the transcribed
text of government documents, and affidavits regarding communications between petitioner's
family and Saudi officials.  Id. at 31-36.  Here, petitioners have come forward with no
information at all suggesting the collusive transfer of Guantanamo Bay detainees.  In addition,
although the United States chose not to respond to the evidence proffered by petitioner in that
case, id. at 37-38, it has produced strong rebuttal evidence here.  Finally, unlike the petitioners in
this case, the detainee in Abu Ali was a United States citizen, a fact that featured prominently in
the reasoning of that case.  Id. at 37-41, 54-65.

warrant extraordinary injunctive relief, and vague or speculative injury will not suffice.  See Wisconsin Gas Co. v. Fed. Energy Reg. Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985) ("the injury must be both certain and great; it must be actual and not theoretical").  In short, the threatened injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, because injunctions are not intended "to prevent injuries neither extant nor presently threatened, but only merely feared."  Comm. in Solidarity v. Sessions, 929 F.2d 742, 745-46 (D.C. Cir. 1991) (quotations omitted).

In this case, the evidence presented by petitioners -- or the lack thereof -- balanced with the sworn declarations of high level government officials, fails to establish that petitioners face irreparable harm in the absence of 30-days' advance notice of transfer.  As indicated earlier, there is no evidence at all that petitioners are being transferred for the purpose of torture or in inappropriate collusion with a foreign government.  Although petitioners express concern about how they might be treated by a foreign state if they are transferred, not only have they identified no legal basis for judicial intervention on their behalf to protect them from the treatment of a foreign state, but they also cannot explain how they would be aided by 30-days' notice of transfer.  Petitioners indicated at the motions hearing that they are most concerned about the possibility of United States involvement in the ongoing detention or torture of transferred detainees, but they do not explain how they could possibly obtain any evidence suggesting that was the plan of the United States in the 30-day window they would have before a transfer.  To the extent that notice would therefore in reality be a precursor as a matter of course to an objection to transfer and months of discovery into the intent of the United States and the foreign

states then the substantial injury to the government (discussed below) becomes all the more pronounced in weighing the respective harms to the parties.

To be sure, if the United States were transferring detainees abroad specifically to thwart this Court's jurisdiction, that might establish irreparable harm.  But petitioners would have to provide some evidence of such conduct, for example by showing that detainees were being transferred to other countries at the behest of, and to serve the interests of, the United States. This they have not done.  Moreover, as discussed above, petitioners have not shown how they would actually be harmed by an alleged loss of jurisdiction.  Every habeas petition, including this one, is ultimately about obtaining release from detention, see Rasul, 124 S. Ct. at 2692, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners.[10]

Petitioners' showing of irreparable harm is thus highly speculative and well short of the necessary certainty for the issuance of a preliminary injunction.  See Wisconsin Gas Co., 758 F.2d at 674.  At its core, the alleged irreparable harm is founded on fear and mistrust.  It may be understandable for petitioners and their counsel to mistrust the Executive, but this Court cannot rule based on petitioners' speculation, innuendo, and mistrust.  The role of the judiciary is a simple one -- determine facts and apply the law to those facts to reach a decision.  The Court will not abdicate that fundamental role here.  On the record before the Court, and the applicable legal standard, petitioners have not established the requisite threat of irreparable harm.

---

[10]  This Court has no authority to prevent a foreign sovereign from pursuing an independent law enforcement action against a detainee, or to order the United States to transfer a detainee to the country of his choosing.  Such matters involve diplomatic and foreign policy considerations, which are generally the exclusive purview of the Executive.

C.        **Harm to Respondents**

The third prong of the preliminary injunction test considers the harm that injunctive relief would impose on other interested parties.  See Cobell, 391 F.3d at 258.  Respondents have explained that the notice, and the judicial review of the transfer that would follow, would render agreements with foreign states contingent and therefore impede the ability of the United States to communicate with foreign nations with a single voice, would chill the frank discussions with foreign governments that are essential to diplomatic relations, and will give foreign states pause before accepting Guantanamo detainees when they are informed that the acceptance carries the condition of a period of delay and then potential inquiry by a United States court into the communications between the United States and the foreign state and even into the treatment the foreign state anticipates providing the detainee following transfer.  See generally Resp'ts' Opp. at 22; Tr. at 68-69; Prosper Decl. ¶ 12.  These are considerable concerns.  See Crosby v. National Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with other governments").  Petitioners' only response is that they are unlikely to contest many transfers, which even if true does little to assuage these concerns because it is the *possibility* of judicial review in any particular case that will hamstring discussions with foreign states.  The substantial harm to the Executive in carrying out its foreign relations militates strongly against the injunction sought in this case.

### D.      Public Interest

Finally, there is a strong public interest against the judiciary needlessly intruding upon the

foreign policy and war powers of the Executive on a deficient factual record.  Where the conduct

of the Executive conforms to law, there is simply no benefit – and quite a bit of detriment – to

the public interest from the Court nonetheless assuming for itself the role of a guardian ad litem

for the disposition of these detainees.  See People's Mojahedin Org., 182 F.3d at 23 ("[I]t is

beyond the judicial function for a court to review foreign policy decisions of the Executive

Branch.").[11]

## II.     Motion to Stay

Respondents have filed a motion to stay this case pending resolution of the appeals in In

re Guantanamo Detainee Cases, 335 F. Supp. 2d 443 (D.D.C. 2005), and Khalid v. Bush, 355 F.

Supp. 2d 311 (D.D.C. 2005), regarding whether the detention of the detainees in those cases

violates any source of law.  Petitioners have objected to a stay, arguing that the case should

proceed on its merits.  Other judges of this Court faced with this question have entered stays.

---

[11]  Petitioners have suggested that this Court could make the 30-day notice of a proposed
transfer a condition of the stay it is issuing in this case.  See infra.  However, the "standards for
evaluating a motion for stay pending appeal are substantially the same as those for issuing a
preliminary injunction," and so if the petitioners cannot meet the prerequisites of a motion for
preliminary injunction (as the Court concludes), it is unlikely that they should receive that same
relief through the backdoor of a stay.  Laborers' Intern. Union of North America v. National Post
Office Mail Handlers, Watchmen, Messengers and Group Leaders Div. of Laborers Intern. Union
of North America, 1988 WL 142384, at *1 (D.D.C. Dec., 23, 1988).  More to the point, perhaps,
petitioners have not identified any legal authority that is likely to be interpreted by the Court of
Appeals in its consideration of the legality of the detention of Guantanamo detainees that would
bear on the question of the transfer of those detainees.  In these circumstances, this Court cannot
discern a reason why a stay of a *transfer* decision pending Court of Appeals resolution of the
*detention* issue would be appropriate.  The Court notes that petitioners did not even attempt to
argue in their papers that Federal Rule of Appellate Procedure 23 requires a stay of a transfer
decision, because petitioners' habeas petition is not presently on appeal.

See, e.g., Abdullah v. Bush, Case No. 05-CV-0023 (RWR) (March 16, 2005 Order); Ameziane v. Bush, Case No. 05-CV-0392 (ESH) (April 2, 2005 Order).  In the interest of judicial economy and avoiding unnecessary litigation, the Court will grant respondents' motion to stay the case pending appellate review of important issues relating to the rights of Guantanamo detainees to challenge the lawfulness of their detention.  Nothing will be gained by this Court addressing issues the D.C. Circuit is about to decide, particularly since a stay would in any event be entered were petitioners to prevail before this Court on those core issues (just as has transpired before Judge Green).  In light of the stay, the Court will issue petitioners' requested order to show cause, but stay respondents' obligation to respond.

Petitioners have also requested that respondents produce their factual returns, which DOD has compiled for each Guantanamo detainee.  Respondents counter that the production of any factual returns should await the D.C. Circuit's decision.  They note that given the large number of habeas corpus petitions, it would be a waste of resources to require production of factual returns before the D.C. Circuit has decided whether they are even necessary.  Furthermore, respondents have raised concerns about the security of the factual returns, noting at the motions hearing that there had been an isolated, inadvertent disclosure of classified information in one case.  Although the Court is sensitive to the concerns of respondents, the factual returns appear necessary for petitioners' counsel effectively to represent petitioners.  Indeed, even initial conversations by counsel with their clients may be very difficult without access to that basic factual information.  Therefore, this Court will require respondents to produce the factual returns for petitioners within one hundred and twenty (120) days.

## CONCLUSION

For the above reasons, petitioners' motion for a preliminary injunction is denied. The Court will grant respondents' motion to stay the case pending the resolution of the appeals in In re Guantanamo Detainee Cases and Khalid v. Bush. However, respondents must file with the Court and provide to petitioners' counsel the factual returns for all petitioners within 120 days. The Court will also enter by reference the protective orders and supplementary orders previously entered by Judge Green in In re Guantanamo Detainee Cases, No. 02-CV-0299. A separate order has been issued.


                                        /s/ John D. Bates
                                       JOHN D. BATES
                                 United States District Judge



        Dated:    April 21, 2005



Copies to:

David A. Hickerson
WEIL, GOTSHAL & MANGES, L.L.P.
1501 K Street, NW
Washington, DC 20005
(202) 682-7000
Fax: 202-857-0939
Email: david.hickerson@weil.com
        *Counsel for Petitioners*

Terry Marcus Henry
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
P.O. Box 883

20 Massachusetts Avenue, NW Rm. 7144
Washington, DC 20044
(202) 514-4107
Fax: (202) 616-8470
Email: terry.henry@usdoj.gov
          *Counsel for Respondents*